**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NICHOL TATE, | ) | CASE NO. 1:17CV1986 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| | ) | |
| Acting Commissioner | ) | **MEMORANDUM OF OPINION** |
| of Social Security, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Nichol Tate ("Plaintiff" or "Tate"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her

applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42

U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the

reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I.  PROCEDURAL HISTORY

In May 2014, Tate filed an application for POD, DIB, and SSI alleging a disability onset date of February 1, 2014 and claiming she was disabled due to depression, lupus, a brain disorder, bipolar disorder, and a stroke.  (Transcript ("Tr.") at 241, 248, 269.)  The applications were denied initially and upon reconsideration, and Tate requested a hearing before an administrative law judge ("ALJ").  (Tr. 178, 187, 194, 199.)

On June 22, 2016, an ALJ held a hearing, during which Tate, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 55-91.)  On August 2, 2016, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 30-52.)  The ALJ's decision became final on August 12, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On September 21, 2017, Tate filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13 & 14.) Tate asserts the following assignment of error:

> Whether the Administrative Law Judge's decision is supported by substantial evidence when she failed to consider whehter[sic] Plaintiff's condition meets or equals Listing 14.06.

(Doc. No. 13 at 1.)

# II.  EVIDENCE

## A.    Personal and Vocational Evidence

Tate was born in December 1972 and was 41 years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 46.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has a high school education and is able to

communicate in English.  (*Id.*)  She has past relevant work as a sales associate, day care center worker, food service worker, order control clerk at a blood bank, and a telemarketer.  (*Id*.)

## B.     Medical Evidence[2]

In 2005, Tate underwent a spinal MRI which revealed degenerative changes in the cervical and lumbar spines and broad-based disc protrusions in the lumbar spine.  (Tr. 356.)

On April 27, 2013, Tate presented to an express care facility, reporting she has been experiencing numbness and tingling in her hands and right arm for the past several weeks.  (Tr. 346-347.)  Physician's assistant George Livingston, P.A., noted Tate's fingers were diffusely swollen and she had limited use of her right hand.  (Tr. 348.)  Mr. Livingston ordered labwork and referred her to a specialist.  (*Id*.)

Tate initially saw rheumatologist Marina Magrey, M.D., on June 4, 2013.  (Tr. 330.)  She reported a history of joint pain, chest pain, oral ulcers, and hiradenitis (a chronic skin condition).  (Tr. 330-331.)  She also relayed she had suffered a stroke in 2002, but had minimal residual deficits in speech, memory, and gait.  (Tr. 331.)  On examination, Tate had nodules under her

---

[2]      The Court notes its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the Parties' Briefs.  Moreover, in her brief, Tate cites to additional evidence which was not before the ALJ for review, but was submitted to the Appeals Council after the ALJ decision.  This evidence includes an opinion letter from treating rheumatologist Maria Antonelli, M.D., and a report from counselor Benjamin Rubin, MSW, LISW.  (Doc. No. 13 at 7, 8, Tr. 12-13, 15-20.)  The Sixth Circuit has held, when the Appeals Council considers new evidence but denies review, the district court's review is limited to the record available to the ALJ.  *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir. 1996).  *See also Elliott v. Apfel,* 28 Fed. App'x 420, 424 (6th Cir. Jan. 22, 2002); *Martin v. Colvin,* 2016 WL 7009167 at *9 (N.D. Ohio Oct. 21, 2016).  As such, the Court will not include these medical records in its recitation of the medical evidence.

breasts and scars from skin procedures. (Tr. 333.) She had tenderness in her fingers, toes, left wrist, elbows, and knees, but full range of motion in her hips and shoulders. (Tr. 334.) She also had a full range of motion in her cervical and lumbar spine and no effusion in her knees. (*Id.*) Dr. Magrey reviewed Tate's blood work and concluded the results were "consistent with connective tissue disorder." (Tr. 335-336.) She ordered additional labwork and prescribed steroids and Plaquenil. (Tr. 336.)

Tate returned to Dr. Magrey on July 6, 2013, reporting chest pain, a cough, and pain in her knees. (Tr. 479.) On examination, she had tenderness in her hands and knees. (Tr. 481.) She had full range of motion in her elbows, shoulders, cervical spine, and lumbar spine. (*Id.*) Her knees displayed no effusion. (*Id.*) Dr. Magrey determined Tate's "inflammatory arthritis has improved" and her joint swelling had subsided. (Tr. 483.) She discontinued Tate's steroids and prescribed Naproxen, Neurotin, and Plaquenil. (*Id.*)

On August 29, 2013, Tate reported worsening joint pain and fatigue to Dr. Magrey. (Tr. 467.) She also described some emotional lability. (*Id.*) On examination, Tate had a full range of motion in her shoulders, elbows, hips, cervical spine, and lumbar spine. (Tr. 469.) She had slight swelling in her wrists, with a painful range of motion. (*Id.*) There was no effusion in her knees, but they were tender. (*Id.*) Dr. Magrey noted Tate's bloodwork was consistent with systemic lupus erythematosus and she renewed Tate's medications. (Tr. 472.)

Tate saw Dr. Magrey again on November 27, 2013, reporting pain her knees and right wrist. (Tr. 456.) She described poor sleep, confusion, and occasional pain in her shoulders, neck, and right side. (*Id.*) On examination, Tate had tenderness in her hands and wrists, with a painful range of motion. (Tr. 458.) She had a full range of motion in her shoulders, hips,

elbows, cervical spine, and lumbar spine. (*Id*.) Her knees and ankles were tender, but she had no spinal tenderness. (*Id*.) Dr. Magrey prescribed Savella and Plaquenil, noting Tate's symptoms were "more consistent with fibromyalgia." (Tr. 460.)

On February 21, 2014, Tate visited rheumatologist Sonia Manocha, M.D. (Tr. 421.) Tate relayed she was having increased forgetfulness and throbbing back pain. (*Id*.) On examination, she had tenderness in her hands and wrists, with a painful range of motion in her wrists. (Tr. 423.) Tate had a full range of motion in her elbows, shoulders, hips, and lumbar spine, but her cervical spine range of motion was limited and painful. (*Id*.) Dr. Manocha noted her symptoms were "more consistent with fibromyalgia" and ordered a cervical spine x-ray. (Tr. 425.)

On March 26, 2014, Tate underwent a functional capacity assessment with physician Janeen Masternick, D.O. (Tr. 412-418.) On examination, Tate had pain with range of motion in "every joint of her body" and tenderness "in every spot on her body [Dr. Masternick] palpated." (Tr. 416.) She had a decreased range of motion in her cervical and lumbar spine. (Tr. 416-417.) Her straight leg raise was negative bilaterally. (Tr. 417.) She ambulated with an assistive device, was able to heel, toe, and tandem walk. (*Id*.) Dr. Masternick noted slight right-sided weakness, but measured 5/5 strength in Tate's upper and lower extremities. (*Id*.) Tate had altered sensation in all dermatones of her upper and lower extremities and 18/18 fibromyalgia tender points. (*Id*.) Tate was able to lift at least 15 pounds at waist level with mild pain, but was unable to squat. (Tr. 418.)

Dr. Masternick offered the following opinion on Tate:

Based on the history and physical exam, the patient has mild functional limitations. The patient can life/carry up to 15 pounds at the waist level frequently.

The patient can sit for a maximum of 30 minute intervals for a maximum of 6 hours per day. She can stand for a maximum of 30 minute intervals for a maximum of 5 hours per day.

(*Id.*)

On June 11, 2014, Tate returned to Dr. Magrey, reporting her medications were not helpful. (Tr. 386.) She indicated she had recently started an antidepressant, but still felt depressed. (*Id.*) On examination, Tate had tenderness in her hands and wrists. (Tr. 388.) Her lumbar spine, shoulder, elbow, and hip range of motion were normal. (*Id.*) She had a limited and painful range of motion in her cervical spine. (*Id.*) Dr. Magrey encouraged Tate to participate in aerobic activity and decreased Tate's Lyrica dosage in hopes it would improve her confusion. (Tr. 389.)

Tate reported continued problems with confusion and memory, as well as stiffness in her shoulders, on October 8, 2014. (Tr. 354.) On examination, she had tenderness in her hands and feet. (Tr. 355.) Her hip and elbow ranges of motion were normal. (Tr. 356.) Her shoulder range of motion was normal, but painful. (*Id.*) She had a limited and painful range of motion in her cervical spine, but her lumbar spine, ankles, and knees were all normal on examination. (*Id.*)

Dr. Magrey noted Tate's symptoms were concerning for "being [a] manifestation of active mixed connective tissue disease." (Tr. 357.) She concluded she would need to "restage [Tate's] disease and try to relate which symptoms are most related to inflammation rather than fibromyalgia." (*Id.*)

On November 19, 2014, Tate visited rheumatologist Maria Antonelli, M.D. (Tr. 536.) She described pain in her feet and knees. (*Id*.) Dr. Antonelli reviewed a chest x-ray from October 2014, which indicated no evidence of interstitial lung disease. (Tr. 539.) X-rays of Tate's knees revealed no significant degenerative changes. (Tr. 548.) Dr. Antonelli concluded Tate had mixed connective tissue disease, but no clear inflammatory arthritis. (Tr. 540.) She prescribed Mobic and recommended Tate begin physical therapy for her knees and fibromyalgia. (*Id*.)

On December 4, 2014, Tate attending a counseling session with therapist Leanne Hardy, PCC-S. (Tr. 531.) She reported irritability and anger. (*Id*.) Tate then visited psychiatrist Jyoti Aneja, M.D. on December 12, 2014. (Tr. 518.) She indicated that while she felt better in the morning than in the afternoon, she felt overwhelmed and stressed. (*Id*.) Dr. Aneja noted Tate had a "limited desire to discuss her symptomatology and how to get better." (*Id*.) Dr. Aneja listed Tate's diagnoses as bipolar disorder and history of alcohol abuse. (Tr. 519.) She prescribed Depakote and Klonopin. (Tr. 520.)

Tate attended a physical therapy session with physical therapist Diana Ina, P.T., on December 17, 2014. (Tr. 512.) On examination, she had mild edema in her knees and normal sensation. (Tr. 514.) Tate had 4/5 strength in her lower extremities and pain with squatting. (Tr. 514, 515.) Her gait was independent without an assistive device. (Tr. 515.)

On December 14, 2015, Tate had a consultation with neurologist Gary Kutsikovich, M.D. (Tr. 576.) She reported her 2002 stroke, along with right-sided paresthesia and confusion. (*Id*.) On examination, Tate did have right-sided weakness and decreased sensation on the right side. (*Id*.) Her coordination was normal, but her gait was hesitant. (*Id*.) Dr. Kutsikovich ordered a

brain MRI and EEG. (*Id*.) The EEG revealed left hemispheric slowing, consistent with Tate's history of a stroke. (Tr. 578.) There was no evidence of epileptiform activity. (*Id*.) The brain MRI revealed scattered predominantly periventricular white matter hyperintensities. (Tr. 579.) These findings were non-specific, but a demyelinating disease could be considered. (*Id*.)

On January 11, 2016, Tate was hospitalized due to difficulty swallowing. (Tr. 561.) Barium swallow testing indicated no evidence of dysphagia causing aspiration. (Tr. 651, 643.) She began a medication regimen and her symptoms did improve. (Tr. 648.) She followed up with gastroenterologist Lubna Chaudhry, M.D., on January 19, 2016. (Tr. 643.) At that time, Tate indicated she was feeling better, but not "100%." (*Id*.)

On January 18, 2016, Tate visited psychiatrist Gabriela Feier, M.D., reporting worsening depression due to her physical health. (Tr. 648.) Her sleep was satisfactory and she denied suicidal ideation. (*Id*.)

Tate returned to Dr. Antonelli on January 28, 2016, indicating her pain was "mostly controlled." (Tr. 629.) She denied any current swelling, but reported difficulty swallowing her medications. (*Id*.) Dr. Antonelli changed Tate's Neurontin prescription to the liquid formulation and advised her to return in 2-3 months. (Tr. 632.)

On February 2, 2016, Tate visited Dr. Kutsikovich for "bouts of confusion" and right sided paresthesia. (Tr. 581.) She denied any abdominal problems. (*Id*.) On examination, Dr. Kutsikovich noted Tate had difficulty with complex commands, right sided weakness, and decreased sensation on the right. (*Id*.) Dr. Kutsikovich reviewed Tate's MRI and EEG and advised her to return in one year. (*Id*.)

8

Tate saw gastroenterologist Rosita Frazier, M.D., on February 11, 2016. She indicated she was doing "okay" since her hospitalization. (Tr. 617.) She denied any weight loss, was tolerating a soft diet, and had intermittent diarrhea. (*Id*.) She continued to have abdominal bloating, but it was improved. (*Id*.) Dr. Frazier noted Tate had a mixed connective tissue disease with "likely global [gastrointestinal] dysmotility." (Tr. 619.)

On March 2, 2016, Tate visited Dr. Antonelli, reporting her liquid medications were helpful. (Tr. 600.) She described morning stiffness, but indicated it was minimal with no swelling. (*Id*.) On examination, Tate had a full range of motion in her elbows, wrists, ankles, and knees. (Tr. 602.) She had no swelling or tenderness in her fingers and her grip was full. (*Id.*)

Tate returned to Dr. Antonelli on April 13, 2016, with hand and wrist pain. (Tr. 596.) On examination, she had decreased grip, but no swelling in her hands. (Tr. 597.) Her knees were tender and she had a full range of motion in her elbows, knees, and wrists. (*Id*.) Dr. Antonelli prescribed a short course of steroids for Tate's pain and stiffness and recommended she have a home health assessment to determine if she required any aids. (Tr. 598.)

## C.     State Agency Reports

### 1.     Mental Impairments

On August 19, 2005, in connection with a prior application, Tate underwent a consultative examination with psychologist David V. House, Ph.D. (Tr. 316-323.) During the examination, she had mild word and date finding difficulties. (Tr. 317.) She presented as "somewhat elliptical, circumstantial and at times not well organized in manner." (*Id*.) She reported depression, crying spells, and suicidal ideation. (Tr. 318.) She described some "mild

delusional material" to Dr. House, including sensing her father's spirit. (Tr. 319.) Dr. House administered IQ testing and Tate received a verbal IQ of 90, a performance IQ of 83, and a full scale IQ of 86. (Tr. 320.) Memory testing revealed Tate was in the 30-39 percentile. (Tr. 321.)

Based upon this examination, Dr. House diagnosed mood disorder, PTSD, and cannabis abuse. (Tr. 322.) He assessed a Global Assessment of Functioning[3] ("GAF") score of 51. (Tr. 323.) Dr. House provided the following opinion on Tate:

> 1. Concentration and attention are mildly limited due to features of depression and anxiety.
>
> 2. Ability to understand and follow directions does not appear to be limited.
>
> 3. Ability to withstand stress and pressure is moderately limited due to features of depression and anxiety.
>
> 4. Ability to relate to others and deal with the general public is mildly limited. She is somewhat socially isolated due to emotional factors.
>
> 5. Level of adaptability is mildly limited. She really does not receive psychiatric treatment.
>
> 6. Insight into her current situation and overall level of judgment are moderately and mildly limited respectively.

(Tr. 322.)

---

[3]     The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

Tate underwent another consultative examination with Dr. House on July 17, 2014. (Tr. 490-498.) Tate reported she saw a psychiatrist for medications, but denied any current counseling. (Tr. 492.) She described poor sleep, crying spells, and hopelessness. (Tr. 493.) She indicated anxiety when driving and avoidance of crowds. (Tr. 494.) Tate also reported she believed in the paranormal and felt "watched." (*Id.*)

Based upon this examination, Dr. House diagnosed mood disorder, PTSD, obsessive-compulsive disorder, dissociative disorder, and cannabis use disorder. (Tr. 497.) He provided the following opinion on Tate:

> **Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions.**
>
> Long-term memory appears intact. She complained of issues with short-term memory and some issues were established through concentration and attention issues. However, she should be able to carry out instructions.
>
> **Describe the claimant's abilities [and] limitations [in] maintaining attention and in concentration and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.**
>
> She has some focus but this seems to drop out to a significant degree and in what appears to be an unpredictable manner. It would seem she is able to follow multistep directions. The examiner would believe she goes through episodes where she becomes very forgetful.
>
> **Describe the claimant's abilities and limitations in responding appropriately to supervision and to cope with co-workers in a work setting.**
>
> She did not present as hostile or obstructionistic. However, she has become more socially isolated over time and especially over the last several months. She said she has gotten to the point where she sees being around other people as abrasive. She sees the grocery stores as too busy and feels uncomfortable around other people. She said she avoids other people. Avoidance is a hallmark of trauma and a diagnosis of posttraumatic stress disorder.

**Describe the claimant's abilities and limitations in responding to work pressures in a work setting.**

Her emotional resources and coping skills appear reduced and are in the process of reducing even further over the process of the last four months. However, she apparently had problems in the past, as well. The examiner would see her as highly dysfunctional and disruptive in work place with highly lowered emotional resources and coping skills.

(Tr. 496-497.)

On August 20, 2014, state agency physician Kristen Haskins, Psy.D., reviewed Tate's medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 118.) Dr. Haskins found Tate had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. (*Id.*) Dr. Haskins also completed a Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 120-122.) Dr. Haskins found Tate was moderately limited in her abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or in proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and (8) respond appropriately to changes in the work setting. (*Id.*) She found Tate was not significantly limited in her ability to understand, remember, and carry out very short and simple instructions. (Tr. 120-121.) Dr. Haskins found no evidence of limitation in Tate's abilities to (1) perform activities within a schedule, maintain

12

regular attendance, and be punctual within customary tolerances; (2) make simple work-related decisions; (3) ask simple questions or request assistance; (4) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (5) be aware of normal hazards and take appropriate precautions; (6) travel in unfamiliar places or use public transportation; and (7) set realistic goals or make plans independently of others. (Tr. 121-122.)

Dr. Haskins explained the basis of her decision as follows:

Forgetfulness

[Claimant] can perform simple, routine 1-4 step tasks

***

Focus seems to drop off to a significant degree and in what appears to be in an unpredictable manner. Coping skills are reduced.

[Claimant] can perform simple, routine tasks in settings that are not fast paced and where there are no strict production standards/quotas, no need for close sustained focus/concentration and someone present for redirection as needed.

***

Socially isolated. Uncomfortable around other people.

[Claimant] can occasionally and superficially interact with coworkers and supervisors. No contact with the general public.

***

Infrequent change.

***

The MRFC given is not an adoption of the ALJ MRFC dated 07/05/08. The MRFC is not being adopted under AR 98-4 (Drummond Ruling) because she has become more socially isolated over time and this was not an issue at the time of the ALJ.

(Tr. 120-122.)

On February 2, 2015, state agency physician Joseph Edwards, Ph.D., reviewed Tate's medical records and completed a PRT and Mental RFC assessment. (Tr. 148-149, 152-154.) He affirmed the findings of Dr. Haskins. (*Id.*)

### 2. Physical Impairments

On July 30, 2014, Tate underwent a consultative examination with Dorothy A. Bradford, M.D. (Tr. 500-507.) She reported pain in her neck, shoulders, arms, knees, ankles, and back. (Tr. 504.) She indicated she did not require a cane, unless she had "to do steps." (*Id.*) Upon examination, Tate's skin had no significant lesions or rashes, but she did have carbuncles under both breasts and scars from previous episodes of hydradenitis axilla. (Tr. 505-506.) She moved slowly and stiffly, but did not require an ambulatory aid. (Tr. 506.) Her spine was tender and Tate was unwilling to perform dorsolumbar spine range of motion testing. (Tr. 507, 502.) Her cervical spine, shoulder, elbow, wrist, and finger range of motion were normal. (Tr. 501, 502.) She had decreased range of motion in her hips and knees due to pain and stiffness. (Tr. 503.) Her upper and lower extremity strength was normal. (Tr. 507.) Dr. Bradford noted Tate was very "sensitive to light touch wherever I touch her." (*Id.*)

Dr. Bradford provided the following assessment of Tate:

Claimant has allege[d] fibromyalgia and has multiple trigger points. She has hidradenitis with lesions in various stages of activity in all intertriginous areas. She does not appear to be a fall risk on any surface for any distance and does not use an ambulatory aid.

(Tr. 507.)

On August 9, 2014, state agency physician Gary Hinzman, M.D., reviewed Tate's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 120.) Dr. Hinzman made the following findings:

The RFC given is an adoption of the ALJ RFC dated 07/05/2008. The RFC is being adopted under AR 98-4 (Drummond Ruling).

(*Id.*) The July 5, 2008 ALJ decision found the following RFC for Tate:

> Since February 1, 2005, the alleged onset date, and with the exception of possible briefer periods of less than 12 continuous months, Ms. Watson[4] has retained the residual functional capacity to perform all the basic work activities described in 20 CFR 404.1521, 404.1545, 416.921 and 416.945 within the following parameters: she can lift, carry, push or pull up to 10 pounds frequently and up to 20 pounds occasionally; and she can sit for six hours in an eight-hour period; and she can stand for two hours in an eight-hour period; and she can walk for two hours in an eight-hour period. Non-exertionally, Ms. Watson has been able to occasionally stoop and occasionally climb ramps and steps, but she has not been able to climb ropes, ladders, or scaffolds. On account of her mental impairments, Ms. Watson has been limited to simple, repetitive work that does not involve high production quotas or fast-paced activity. In addition, Ms. Watson has only been able to work in environments where changes in the work environment would not be more than routine, and where such changes would not occur more than occasionally.

(Tr. 104.)

On January 26, 2015, state agency physician Rannie Amiri, M.D., reviewed Tate's medical records and completed a Physical RFC Assessment. (Tr. 150-152.) Dr. Amiri determined Tate could lift and carry 20 pounds occasionally, lift and carry 10 pounds frequently, stand and/or walk for 2 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. (Tr. 150.) The doctor further found Tate could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently balance, kneel, crouch, and crawl, and occasionally stoop. (Tr. 150-151.) Dr. Amiri opined Tate should avoid concentrated exposure to environmental irritants and avoid unprotected heights. (Tr. 151.)

**D.     Hearing Testimony**

---

[4]     Tate's name was Nichol Watson at the time of her prior application for disability.

During the June 22, 2016 hearing, Tate testified to the following:

- She lives with her two daughters. (Tr. 61.) She occasionally performs light housework, but not on a regular basis. (Tr. 63.) Her daughters assist her with the household chores. (Tr. 63-64.) She does not do any laundry or drive. (Tr. 64.) She will occasionally go grocery shopping. (*Id.*) She enjoys growing vegetables. (Tr. 67.)

- She last worked selling chips and candy. (Tr. 68.) She also worked at a daycare center, a telemarketing company, and the American Red Cross. (Tr. 70, 72, 73, 74.)

- She has lupus and a mixed connective tissue disorder. (Tr. 76.) These impairments cause her pain, depression, and fatigue. (*Id.*) Her pain is "everywhere," including her elbows, wrists, fingers, ankles, knees, back, neck, and shoulders. (*Id.*) She has flares of symptoms, where her pain, depression, and fatigue are worse. (Tr. 77.) Weather exacerbates her symptoms. (Tr. 78.)

- She naps throughout the day. (Tr. 78.) She wears braces on her wrists. (Tr. 79.) She has difficulty holding cups, bowls, and plates. (Tr. 80.) She has trouble holding a pencil and must use larger pencils and crayons in order to write. (*Id.*)

- She has problems lifting heavy objects or reaching her out in front of or over her body. (Tr. 81.) Her right shoulder and elbows feel weak. (*Id.*)

- She uses a cane "on days [her] knees are really paining." (Tr. 82.) She cannot stand or walk very long. (Tr. 83.)

- She has trouble with her memory and concentration. (Tr. 84.)

The VE testified Tate had past work as a daycare center worker (D.O.T. #359.677-018); food service worker or cafeteria worker (D.O.T. #311.677-014); order control clerk, blood bank medical services (D.O.T. #245.367-026); telemarketer (D.O.T. #299.357-014); and sales associate, any industry (D.O.T. #299.357-014). (Tr. 87-86.) The ALJ then posed the following hypothetical question:

> First off, I would like you to consider a person with the same age, education, and past work as the claimant who is able to occasionally lift and carry 20 pounds and frequently lift and carry ten pounds, is able to stand and walk

two hours of an eight-hour workday, is able to sit for six hours of an eight-hour workday. We have unlimited push and pull other than shown for lift and/or carry, could occasionally climb ramps and stairs, could never climb ladders, ropes, or scaffolds, could frequently balance, kneel, and crouch, and could occasionally crawl and stoop. This individual must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation and must avoid all exposure to hazards such as unprotected heights. In addition, this hypothetical individual can perform simple, routine tasks consistent with unskilled work with no fast pace or high production quotas and with occasional superficial interaction with both co-workers and supervisors and by superficial I mean of a short duration for a specific purpose, and can perform no direct work with the general public and by that I mean customer service type of work, and then finally can perform work with infrequent change.

(Tr. 87-88.)

The VE testified the hypothetical individual would be not be able to perform Tate's past work. (Tr. 88.) The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as document specialist (sedentary, unskilled), surveillance system monitor (sedentary, unskilled), and addresser (sedentary, unskilled). (*Id.*)

The ALJ then added the additional limitations of "frequent handling and fingering bilaterally" and "low stress work and by that I mean no arbitration, negotiation, responsibility for the safety of others, and/or supervisory responsibility." (Tr. 88-89.) The VE testified the hypothetical individual could perform the same jobs provided for the first hypothetical. (Tr. 89.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Tate was insured on her alleged disability onset date, February 1, 2014, and remained insured through December 31, 2018, her date last insured ("DLI.")  (Tr. 35.) Therefore, in order to be entitled to POD and DIB, Tate must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.  The claimant has not engaged in substantial gainful activity since February 1, 2014, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: fibromyalgia, obesity, plantar fasciitis, degenerative disc disease, mixed connective tissue disease, osteoarthritis of the knee, past cerebral vascular accident (July 21, 2002), affective disorder (mood disorder not elsewhere classified, bipolar disorder), anxiety disorder (posttraumatic stress disorder), and obsessive compulsive disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she is able to

occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, is able to stand and walk 2 hours of an 8-hour workday, is able to sit for 6 hours of an 8-hour workday, unlimited push and pull other than shown for lift and/or carry; occasionally climb ramps and stairs; never climb ladders, ropes and scaffolds; frequently balance, kneel, crouch; occasionally crawl and stoop; avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation; avoid all exposure to hazards, meaning unprotected heights; can perform frequent handling and fingering bilaterally; can perform simple routine tasks (unskilled work) with no fast pace or high production quotas; with occasional superficial interaction (meaning of a short duration for a specific purpose) with co-workers and supervisors and no direct work with the general public (i.e. public service type work); can perform low stress work meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on December **, 1972 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 35-47.)

# V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

## A.    Listing 14.06

In her sole assignment of error, Tate argues remand is required because the ALJ failed to expressly consider Listing 14.06 at step three.  (Doc. No. 13 at 9-11.)  She asserts the "ALJ's decision is devoid of any discussion or analysis whatsoever regarding the listing pertaining to [her] arguably most severe medical impairment – mixed connective tissue disorder."  (*Id*. at 10.) Tate contends it "constitutes legal error for the ALJ to not consider and address in her written decision whether Plaintiff's condition satisfies the criteria of Listing 14.06 or not."  (*Id*. at 11.) She concludes "[s]uch error renders her decision wholly unsupported by substantial evidence." (*Id*.)

The Commissioner maintains "the ALJ did not commit reversible error by failing to discuss Listing 14.06."  (Doc. No. 14 at 12.)  The Commissioner acknowledges the ALJ did not discuss Listing 14.06 in the decision, but argues Tate "did not claim that her impairments met listing 14.06, or any other listed impairment at step three of the sequential evaluation process." (*Id*. at 9.)  She asserts Tate "has not shown that her impairments met the criteria of either subsection of listing 14.06."  (*Id*. at 10.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec*., 381 Fed. Appx. 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age,

education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

"[N]either the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. App'x 426, 432 (6th Cir. 2014)(quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 Fed. App'x 639, 641 (6th Cir. 2013)). However, an ALJ must consider and discuss a relevant listing when the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Id.* (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)). In order to raise a "substantial question," a claimant "must point to specific evidence that demonstrates [she] reasonably could meet or equal every requirement of the listing." *Id. See also Dew v. Comm'r of Soc. Sec.*, 2017 WL 744238 at *2 (E.D. Mich. Feb. 27, 2017). Without

this specific evidence, an ALJ does not "commit reversible error by failing to evaluate a listing at Step Three." *Smith-Johnson*, 579 Fed. App'x at 433. *See also Roberts v. Comm'r of Soc. Sec.*, 2017 WL 5501323 at *10 (N.D. Ohio Oct. 19, 2017); *Andres v. Comm'r of Soc. Sec.*, 2017 WL 3447849 *16 (N.D. Ohio July 11, 2017).

Here, at step two, the ALJ found Tate suffered from the severe impairments of fibromyalgia, obesity, plantar fasciitis, degenerative disc disease, mixed connective tissue disease, osteoarthritis of the knee, a remote cerebral vascular accident, affective disorder, anxiety disorder, and obsessive-compulsive disorder. (Tr. 36.) At step three, the ALJ determined Tate did not meet or equal any listed impairment. (*Id.*) When reaching this conclusion, the ALJ expressly discussed Listing 1.02 (Major Dysfunction of a Joint), Listing 1.04 (Disorders of the Spine), and Listing 8.06 (Hidradenitis Suppurativa). (Tr. 36-37.)

However, the ALJ did not discuss Listing 14.06, which is the listing for undifferentiated and mixed connective tissue disease. In order to qualify as disabled under Listing 14.06, Tate must satisfy the following requirements:

> a. General. This listing includes syndromes with clinical and immunologic features of several autoimmune disorders, but which do not satisfy the criteria for any of the specific disorders described. For example, you may have clinical features of SLE and systemic vasculitis, and the serologic (blood test) findings of rheumatoid arthritis.
>
> b. Documentation of undifferentiated and mixed connective tissue disease. Undifferentiated connective tissue disease is diagnosed when clinical features and serologic (blood test) findings, such as rheumatoid factor or antinuclear antibody (consistent with an autoimmune disorder) are present but do not satisfy the criteria for a specific disease. Mixed connective tissue disease (MCTD) is diagnosed when clinical features and serologic findings of two or more autoimmune diseases overlap.

20 C.F.R. Part 404, Subpart P, Appendix 1, Section 14.00(D)(5). In addition, Tate must show:

25

A.  Involvement of two or more organs/body systems, with:

1.  One of the organs/body systems involved to at least a moderate level of severity; and

2.  At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

OR

B.  Repeated manifestations of undifferentiated or mixed connective tissue disease, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at a marked level:

1.  Limitation of activities of daily living.

2.  Limitation in maintaining social functioning.

3.  Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, and pace.

*Id*. at § 14.06

The Court finds Tate has not shown the record raises a substantial question as to whether she meets or equals the requirements of Listing 14.06.  Thus, the ALJ's failure to discuss the Listing was not reversible error.  To be clear, Tate does not point to any specific evidence demonstrating she could meet or equal this Listing.  Rather, Tate asserts the mere failure to discuss a specific listing in and of itself requires a remand.  (Doc. No. 13 at 11.)  Tate vaguely notes, without citing any evidence in the record, she suffers from "chronic pain, joint pain/stiffness, and fatigue."  (*Id*.)  This minimal discussion does not fulfill Tate's burden of pointing to evidence which raises a "substantial question" as to whether she satisfies the requirements of Listing 14.06.  *See Andres*, 2017 WL 3447849 at *16.  *See also Smith-Johnson*, 579 Fed. App'x at 432 ("A claimant must do more than point to evidence on which the ALJ

could have based his finding to raise a "substantial question" as to whether he has satisfied a listing . . .Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing.")(internal quotations omitted).[5]

Turning to the specific requirements of Listing 14.06, the medical evidence does establish Tate has been diagnosed with an connective tissue disorder, with the supporting bloodwork as required by the listing. (Tr. 335-336.) However, Tate has not directed this Court's attention to any evidence which confirms her connective tissue disorder involves two or more body systems at a moderate level of severity. Tate does have well-documented joint pain and limitation. (Tr. 356, 458, 388.) She briefly had some issues with swallowing, but diagnostic testing indicated no evidence of dysphagia causing aspiration. (Tr. 643.) Within a few weeks, Tate's condition had improved, she was on a soft diet, and had no weight loss. (Tr. 643, 617.) While Tate has reported fatigue, there is no evidence of any persistent fever, malaise, or involuntary weight loss, as required under Listing 14.06A.

Similarly, Tate has not presented any evidence to fulfill the requirements of 14.06B. She has not shown she has a marked limitation in activities of daily living, maintaining social

---

[5] It is also notable that, at the hearing, Tate nor her counsel presented any argument Tate met or equaled Listing 14.06. Instead, Tate's counsel asserted Tate should be found disabled at step five. (Tr. 60-61.) The Sixth Circuit has found where a claimant does not argue she meets a Listing at the hearing, and offers no evidence to show the Listing applies to her, the ALJ is not obligated to discuss that specific listing in the decision. *See Wilson v. Comm'r of Soc. Sec.*, 618 Fed. App'x 281, 286 (6th Cir. July 15, 2015). *See also Malone v. Comm'r of Soc. Sec.*, 507 Fed. App'x 470, 472 (6th Cir. Nov. 29, 2012) (rejecting the claimant's assertion that the ALJ had to specifically discuss a particular listing where the claimant did not argue that he had a listed impairment at his administrative hearing).

functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, and pace. When evaluating her mental impairments, the ALJ did specifically discuss these areas and found no more than moderate difficulties. (Tr. 37-38.) Likewise, the state agency physicians found no more than moderate limitations in these areas. (Tr. 118, 120-122, 148-149, 152-154.) A review of her treatment notes indicates Tate does have issues with confusion, memory, and depression. (Tr. 354, 648.) However, during her consultative examination, she was able to interpret proverbs, present a coherent narrative, and her memory was intact. (Tr. 495.) Tate has not provided any evidentiary support demonstrating she could reasonably meet or equal Listing 14.06A or 14.06B.

Moreover, the ALJ made sufficient factual findings elsewhere in the decision to support her step three conclusions. *See Forrest v. Comm'r of Soc. Sec.*, 591 Fed App'x 359, 366 (6th Cir. Nov. 17, 2014). *See also Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) (looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination, and finding no need to require the ALJ to "spell out every fact a second time"). Tate herself acknowledges the ALJ "repeatedly discusses the treatment for and symptoms relating to mixed connective tissue disorder." (Doc. No. 13 at 11.) Indeed, a review of the decision indicates the ALJ discussed Tate's mixed connective tissue disease, noted its relation to her gastrointestinal issues, and also reviewed the treatment for her joint pain. (Tr. 40-44.) The ALJ concluded the "objective evidence shows that despite the claimant's pain and joint stiffness, she ambulates without an assistive device, has full range of motion in most joints, and only slightly decreased strength." (Tr. 46.)

In sum, as Tate has not provided any evidentiary support demonstrating she could reasonably meet or equal Listing 14.06, she has not shown the record raises a "substantial question" as to whether the requirements of the listing may be met.  *See Roberts v. Comm'r of Soc. Sec.*, 2017 WL 5501323 at *11 (N.D. Ohio Oct. 19, 2017)(finding claimant did not raise a substantial question as to whether a listing was met, where he failed to provide evidence for either of the two requirements of the listing, and simply argued generally regarding his symptoms).  Without this specific evidence, an ALJ does not "commit reversible error by failing to evaluate a listing at Step Three."  *Smith-Johnson*, 579 Fed. App'x at 433.

Accordingly, Tate's assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: July 13, 2018